# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AQUILEX HYDROCHEM, INC., | ) | CASE NO. 5:11CV0319 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | |
| RONALD MARSHALL, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| | ) | |
| DEFENDANTS. | ) | |
| | ) | |

Before the Court is plaintiff's motion, pursuant to Fed. R. Civ. P. 15, to file its Second Amended Complaint. (Doc. No. 36.) Defendants filed their opposition brief (Doc. No. 38) and plaintiff filed a reply (Doc. No. 39.) With leave, defendants filed a sur-reply. (Doc. No. 41.) For the reasons discussed below, the motion is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Complaint, as Amended (Doc. No. 8)

On February 14, 2011, plaintiff, Aquilex Hydrochem, Inc. ("HydroChem") filed a Complaint (Doc. No. 1) against defendant Ronald Marshall ("Marshall") alleging breach of a post-termination restrictive covenant contained in a contract between Marshall and HydroChem. The contract at issue is controlled by Texas law. On February 22, 2011, HydroChem filed its Amended and Substituted Complaint (Doc. No. 8, hereafter "Complaint") repeating its allegations against Marshall and adding similar claims against Blake Brown ("Brown"). Jurisdiction was based on diversity of citizenship since HydroChem was alleged to be a

Delaware corporation with its principal place of business in Deer Park, Texas (Compl. ¶ 2) and both Marshall and Brown were alleged to be Ohio citizens (*Id.* ¶¶ 3, 4.)

The Complaint alleges that Marshall, who was employed as HydroChem's Vice President of National Accounts from 1999 until his resignation in early January 2011, signed a Proprietary Information Agreement (the "Marshall Agreement") in exchange for employment with HydroChem, access to HydroChem's confidential information and trade secrets, specialized training, and/or resources to facilitate his ability to generate discoveries, inventions, and improvements relating to HydroChem's services and processes. (Compl. ¶¶ 10-12.) The Marshall Agreement provided that "[f]or a period of two years after termination of employment with Company [HydroChem], Employee [Marshall] will refrain from recruiting, or in any way participating in the recruiting, of any other Company employee who is engaged or was engaged by Company in an area of technology for which he or she is being recruited." (*Id.* ¶ 13.) It further provided that "Employee [Marshall] will not use or disclose to any third party any material or any technical or business information that is confidential to Company [HydroChem] or its Affiliates, except as authorized by Company." (*Id.* ¶ 14.)

In his role as Vice President of National Accounts, Marshall was responsible for contacting customers, supervising customer accounts, interacting with account managers, and generally ensuring that customers were happy with HydroChem's services. (Compl. ¶ 19.) He had access to all of HydroChem's confidential and proprietary information, including trade secrets. (*Id.* ¶ 20.)

As part of his job, Marshall managed, among others, the Marathon Oil account in Catlettsburg, Kentucky ("the Marathon Account"), which was serviced by HydroChem's Ashland, Kentucky branch office. (Compl. ¶ 21.) Marshall worked closely with the Ashland

2

Branch Manager, Matt Burke, who was responsible for overseeing the operation of the Ashland branch and all customers serviced by that branch. He, too, was privy to HydroChem's confidential and proprietary information. (*Id*. ¶¶ 22-23.)

Marshall also worked closely with Bill Rowe, the Ashland branch acting Operations Manager, who had previously served as HydroChem's Site Quality Manager for the Marathon Catlettsburg site. As Site Quality Manager, Rowe had been "the face" of HydroChem for the Marathon Account, responsible for ensuring that HydroChem's day-to-day operations met customer expectations as to quality, efficiency, safety, and budget. He had access to and was familiar with HydroChem's technology, financial information, margins, and customer relationships. (Id. ¶¶ 24-25.)

Marshall also worked closely with the Canal Fulton, Ohio branch, which serviced another customer (Timken Steel) for which Marshall was responsible. (Compl. ¶ 27.)

On January 10, 2011, Marshall resigned his employment with HydroChem and immediately went to work for PSC, a HydroChem competitor, out of its Akron, Ohio office. (Compl. ¶ 33.) Like HydroChem, PSC provides industrial cleaning services, including hydroblasting, vacuuming, and tank and chemical cleaning." (*Id*. ¶ 34.) On January 21, 2011, HydroChem sent Marshall a letter reminding him of his obligations under the Marshall Agreement; HydroChem also sent a letter to PSC informing it of the agreement and Marshall's obligations thereunder. (*Id*. ¶¶ 35-36.)

Notwithstanding his agreement with HydroChem, on January 26, 2011, Marshall contacted Burke to set up a meeting so that Marshall could encourage Burke to leave HydroChem and join Marshall at PSC. (Compl. ¶ 37.) He also contacted Rowe on several

occasions for the same purpose. (*Id*. ¶ 38.) Marshall solicited Burke and Rowe for positions at PSC similar to the ones they currently hold at HydroChem. (*Id*. ¶39.)

Brown was employed by HydroChem from 2005 until he resigned on January 28, 2011. At that time, he was the Operations Manager in the Canal Fulton, Ohio branch. (Compl. ¶ 15.) In January 2005, Brown signed a Confidentiality and Proprietary Information Agreement (the "Brown Agreement") in exchange for which  HydroChem provided him with employment, access to confidential information and trade secrets, specialized training, and/or resources to facilitate his ability to generate discoveries, inventions, and improvements relating to HydroChem services and processes. (*Id*. ¶ 16.) The Brown Agreement provided that, "while you [Brown] are employed by Hydrochem and for a period of two years after your employment with HydroChem terminates, you will not, either directly or indirectly, solicit, recruit, hire or engage in any other effort or activities which are designed to encourage any other HydroChem employee to become employed by, or accept employment with, a company that competes with HydroChem." (*Id*. ¶ 17.) Brown also agreed that he would "be forever obligated not to disclose or use HydroChem's or any customer's or vendor's proprietary, confidential or trade secret information and to maintain the confidentiality of this information indefinitely." (*Id*. ¶ 18.)

In his role as Operations Manager of the Canal Fulton branch, Brown was responsible for overseeing employees at customer facilities serviced by that branch. In that role, he had access to confidential and proprietary information, including technology, methodologies, pricing, margins, safety protocols, and customer relationship issues. (Compl. ¶ 28.) Crew leaders, field supervisors, and Site Quality Managers reported to Brown and he had regular interaction with such employees to discuss operational issues and other HydroChem confidential information and/or trade secrets. (*Id*. ¶ 29.)

4

Prior to being Operations Manager, Brown was the Site Quality Manager at Canal Fulton for the Timken Steel worksite. He had similar job duties as Rowe, the Site Quality Manager at the Ashland branch for the Marathon Catlettsburg site. (Compl. ¶ 30.)

As Operations Manager, Brown had close relationships with Senior Crew Leader, Javier Vergara, Jr., who had on-site interactions with personnel from various HydroChem customers, with whom he developed a rapport and goodwill on behalf of HydroChem. (*Id*. ¶ 31.) Brown also worked closely with other Canal Fulton employees, including Linda Wenzel (Dispatcher), Raymond Grim (Senior Crew Leader), Bob Amos (Crew Leader), Devin Knapp (Equipment Technician I), and Kurt Hooper (Senior Crew Leader), all of whom had confidential information about HydroChem, its customers, and its proprietary technology and processes.  (*Id*. ¶ 32.) In particular, Grim, Amos, and Knapp performed most of their work at the Timken Steel location and had significant experience and knowledge of that customer's requirements, preferences, and facilities. (*Id.*).

Brown resigned his position with HydroChem on January 31, 2011 and, like Marshall, joined PSC's Akron Office. (Compl. ¶ 33.) Shortly thereafter, he solicited Vergara to leave HydroChem and join PSC as a crew leader, at a higher hourly wage and with the possibility of significant overtime. (*Id*. 40.) As a result, HydroChem sent a letter to Brown on February 11, 2011 demanding that he cease and desist from soliciting HydroChem employees on behalf of PSC; but Vergara resigned on February 14, 2011 and announced his intention to join PSC. (*Id.* ¶¶ 41, 42.)

On February 15, 2011, five additional employees (Wenzel, Grim, Amos, Knapp and Hooper) all announced their resignations from HydroChem's Canal Fulton branch and their

intentions to join PSC. Plaintiff believes all five were solicited by Marshall and/or Brown to leave HydroChem and join PSC. (Compl. ¶ 43.)

All the employees recruited to date by Marshall and Brown were high-performing individuals holding strategically important positions with HydroChem. They have knowledge of and relationships with HydroChem's customers and HydroChem's proprietary technology and methods. (Compl. ¶ 44.)

HydroChem's Complaint alleges breach of contract against Marshall (Count I) and Brown (Count II). It seeks preliminary[1] and permanent injunctions, as well as damages and disgorgement.

## B.  Post-Complaint Developments

In preparation for a hearing on HydroChem's request for a preliminary injunction, the parties engaged in expedited discovery. HydroChem asserts in the instant motion that, during their depositions, both Marshall and Brown admitted to soliciting HydroChem employees. They purportedly described "an overarching scheme or conspiracy at PSC that involved a number of high-ranking executives and other former HydroChem employees that was designed to cripple HydroChem by soliciting away key employees." (Doc. No. 36-1, at 2-3.)[2]

---

[1] The Complaint also sought a temporary restraining order. On March 1, 2011, the parties agreed to a TRO (Doc. No. 13) which was later extended by verbal agreement during a telephone status conference (*see* Minutes of Proceedings, 4/25/11). The Court scheduled a preliminary injunction hearing for July 12, 2011. That date was later continued to October 11, 2011, on the parties' agreed motion to extend deadlines. (*See* Doc. Nos. 31, 32.) The Court has also indicated that it may have a problem with that date and has advised counsel to hold open the dates of October 19, 20, and 21 should the hearing need to be rescheduled. (*See*, Doc. No. 35.)

[2] The Memorandum offers no evidence in support of this assertion. The Reply brief filed by plaintiff does contain some actual references to the depositions of Marshall and Brown. However, at least one of the referenced deposition exhibits is not included. (*See* Doc. No. 39, at 2 n. 3 -- reference to Marshall Depo., Ex. 19, which is not attached.)

On June 7, 2011, the parties filed a proposed stipulated order granting a 30-day stay, representing that they were "diligently pursuing a resolution of the disputes underlying this litigation." (Doc. No. 33.) On June 8, 2011, the Court granted the 30-day stay. (Doc. No. 34.)

**C.**     **The Proposed Second Amended Complaint**

On July 8, 2011, plaintiff filed the instant motion to amend the complaint a second time. The proposed Second Amended Complaint ("PSAC") is attached to the motion. It seeks to add the following as defendants: Dylan Palmer,[3] Charles Brownell III,[4] PSC Industrial Outsourcing, LP ("PSC"), Randall Decker, James Kuehn, Elizabeth Crowe, and Brad Clark.[5] It asserts a new federal question claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, against Marshall, PSC and Decker (Count I), as well as state law claims of unauthorized use of property under O.R.C. § 2913.01 against Marshall, PSC and Decker (Count II -- a new claim), breach of contract against Marshall (Count III), against Brown (Count IV), against Palmer (Count V -- a new claim), and against Brownell (Count VI -- a new claim), tortious interference with former employee agreements against PSC, Decker, Kuehn, Crowe, and Clark

---

[3] The allegations against Palmer are similar to those against Marshall and Brown. Palmer was employed by HydroChem from 2005 until his resignation in January 2011, at which time he held the position of Branch Manager at the Canal Fulton, Ohio branch office. He had signed a Confidentiality and Proprietary Information Agreement at the commencement of his employment with HydroChem, which contained a non-solicitation agreement. In his role as Branch Manager, he supervised employees, had access to confidential and proprietary information, and regularly discussed operational issues. (PSAC, ¶¶ 27-30, 52-54.)

[4] Similar to Marshall, Brown, and Palmer, the PSAC alleges that Brownell was employed by HydroChem from 1993 until his resignation in March 2011, at which time he held the position of National Accounts Director. Prior to that, he had been the General Manager of the North Central Region for HydroChem and, in that role, he supervised branch managers at Canal Fulton and Ashland. He had access to and regularly used HydroChem's confidential and proprietary information. He developed goodwill and relationships with HydroChem's customers, vendors, and employees. He, too, had signed an Employment Agreement, which contained both a non-solicitation agreement and a non-disclosure agreement. He also signed a Retention Agreement which contained similar provisions. (PSAC ¶¶ 31-37, 55-56.)

[5] Decker, Kuehn, Crowe and Clark are alleged to be current executives and officers for PSC "involved in the development and implementation of a scheme and conspiracy to solicit HydroChem employees for the purpose of crippling HydroChem's business and establishing an immediate foothold in northern Ohio (where PSC has a limited presence) without the normal costs associated with opening a new office." (PSAC ¶ 16.)

(Count VII -- a new claim), tortious interference with employment relationships against PSC,

Decker, Kuehn, Crowe and Clark (Count VIII -- a new claim),[6] breach of duty against Marshall

(Count IX -- a new claim), and tortious interference with prospective business relationships

against PSC and Crowe (Count X -- a new claim).

## II. DISCUSSION

**A.      Amending Under Rule 15**

Fed. R. Civ. P. 15(a) provides:

(a)      Amendments Before Trial.

>   (1)      Amending as a Matter of Course. A party may amend its pleading
>   once as a matter of course within:
>
>   >   (A)      21 days after serving it, or
>   >   (B)      if the pleading is one to which a responsive pleading is
>   >   required, 21 days after service of a responsive pleading or
>   >   21 days after service of a motion under Rule 12(b), (e), or
>   >   (f), whichever is earlier.
>
>   (2)      Other Amendments. In all other cases, a party may amend its
>   pleading only with the opposing party's written consent or the
>   court's leave. The court should freely give leave when justice so
>   requires.

The Supreme Court has explained:

> In the absence of any apparent or declared reason -- such as undue delay, bad faith
> or dilatory motive on the part of the movant, repeated failure to cure deficiencies
> by amendments previously allowed, undue prejudice to the opposing party by
> virtue of allowance of the amendment, futility of amendment, etc. -- the leave
> sought should, as the rules require, be "freely given." Of course, the grant or
> denial of an opportunity to amend is within the discretion of the District Court,
> but outright refusal to grant the leave without any justifying reason appearing for
> the denial is not an exercise of discretion; it is merely abuse of that discretion and
> inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).

---

[6] This is actually misnumbered as a second Count VII.

**B.**     **Analysis**

Although this case has been pending since February 14, 2011, very little has been accomplished toward addressing the merits of the two breach of contract claims set forth in the Complaint. The Case Management Conference has not even been conducted in this case, nor has a Case Management Plan been issued. In addition, although "expedited" discovery has been occurring in preparation for the preliminary injunction hearing, general discovery has not yet commenced.

Those procedural facts might appear to argue in favor of allowing the amendment. *See Ed Schmidt Pontiac-GMC Truck, Inc. v. DaimlerChrysler Motors Co.*, 538 F.Supp.2d 1032, 1037 (N.D. Ohio 2008), quoting *Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 409 (6th Cir. 2000) ("[d]elay, standing alone, is an insufficient basis for denying leave to amend, and this is true no matter how long the delay"). However, what renders this case an exception to the usual rule of freely allowing amendment of the pleadings is the scope of the allegations and remedies sought in the Complaint as compared to the scope of the allegations and remedies sought in the PSAC *and* the fact that HydroChem has seemingly delayed seeking leave to amend a second time for strategic reasons.

The Complaint has two counts of breach of contract -- one each against Marshall and Brown. The prayer for relief seeks, *inter alia*, a "preliminary injunction [...] enjoining Marshall and Brown, their agents, servants and employees, and those people in active concert or participation with them, from breaching the Marshall Agreement and Brown Agreement, respectively, including by soliciting HydroChem employees or using or disclosing confidential information belonging to HydroChem[.]" (Doc. No. 1, Prayer for Relief at A.)

9

In contrast, the PSAC, has ten counts, eight of them entirely new, and includes seven (7) new defendants. Its prayer for relief is similar to that of the Complaint, seeking a "preliminary injunction [...] enjoining the Former Employee Defendants, their agents, servants and employees, and those people in active concert or participation with them, from breaching the Marshall, Brown, Palmer, and Brownell Agreements, respectively, including by soliciting HydroChem employees or using or disclosing confidential information belonging to HydroChem[.]" (Doc. No. 36-2, Prayer for Relief at A.)

Defendants argue that allowing the amendment would unduly prejudice them within the meaning of *Foman*. The Sixth Circuit has explained how to evaluate prejudice:

> In determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would: require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the plaintiff from bringing a timely action in another jurisdiction.

*Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994).

Quite clearly, should the Court allow plaintiff to amend the complaint in the manner it seeks to amend, it will be impossible to proceed with the scheduled preliminary injunction hearing. The scope of even the "expedited" discovery (much less the general fact discovery) will broaden dramatically because of all the additional parties and claims and the fact that a preliminary injunction is also sought against all the new defendants. It is entirely possible that the new defendants might also further delay the proceedings by filing motions to dismiss. Plaintiff might be willing to endure the delay occasioned by a Second Amended Complaint,[7] but the prejudice to defendants Marshall and Brown is definitely "undue."

---

[7] The Court is somewhat surprised that plaintiff would be eager to so dramatically expand the scope of this case since plaintiff has suggested in conferences before the Court that, due to the breaches by Marshall and Brown, plaintiff is on the brink of financial disaster. Even the Complaint alleges that disclosure of the confidential

In their Answer to the Complaint (Doc. No. 21), Marshall and Brown maintain that the "post-termination restrictive covenants" they have purportedly breached are unenforceable for failure of consideration; are vague, overly broad, unreasonable, and impose a greater restraint than necessary to protect HydroChem's interests; and are barred by Texas law.[8] They further assert that HydroChem is not a party to the agreements, which were never properly assigned to HydroChem by its predecessor, and lacks standing to sue on the agreements.

In other words, put simply, Marshall and Brown assert that they have done nothing wrong and, in any event, the agreements are unenforceable under Texas law. Even so, they *voluntarily* agreed to a Temporary Restraining Order and to a subsequent extension of that TRO. They also *voluntarily* agreed to the extension of the hearing on the request for a preliminary injunction from July to October. In the meantime, they are complying with the terms of the very agreements which they challenge as unenforceable. If their legal position is correct, and the Court expresses no view in that regard, permitting the filing of the PSAC and the

_____

information the defendants possess would "immediately and irreparably" harm HydroChem (Compl. ¶ 51) and, if defendants are successful in soliciting Burke and Rowe to leave HydroChem, "it would severely disrupt, *if not destroy*, HydroChem's Ashland branch office, which generates approximately $4.5 million in revenue annually." (Compl. ¶ 52, emphasis added.) HydroChem also alleges that "because Defendants have already successfully recruited at least eight employees from the Canal Fulton branch (including Brown), that branch is *in danger of suffering a severe business disruption and/or losing all its employees*[.]" (Compl. ¶ 53, emphasis added.) Presumably it is this very urgency which required the TRO and, in plaintiff's view, requires a preliminary injunction.

[8] By their terms, each agreement at issue is governed by Texas law. Defendants argue that Texas law generally disfavors covenants not to compete and covenants not to solicit because they have the effect of restraining freedom of enterprise for both employers and their employees, which results in a restraint on competition. *See, e.g.*, *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex.App.-Hous. (1 Dist.) 2003) ("In Texas, to resign from one's employment and go into business in competition with one's former employer is, under ordinary circumstances, a constitutional right."). *Abetter Trucking*, however, also notes that "[a]n employer who wishes to restrict the post-employment competitive activities of a key employee may seek to accomplish that goal through a non-competition agreement." *Id. See also*, *Marsh USA, Inc. v. Rex Cook*, No. 09-0558, 2011 WL 2517019, at * 2 (Tex. June 23, 2011) ("Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [Texas Covenants Not to Compete] Act.").

significant delay such filing will trigger is highly prejudicial to them, not only because of that delay but also because the PSAC would "make the case unduly complex and confusing." *Duchon v. Cajon Co.*, 791 F.2d 43, 48 (6th Cir. 1986). Defendants have a right to have this case against them resolved sooner rather than later or, at the very least, to have the preliminary injunction issue decided. Plaintiff's argument that defendants should welcome additional defendants with whom to share liability borders on the absurd, given the fact that defendants deny any liability.

Furthermore, it is undisputed that HydroChem has known the facts underlying the PSAC since mid-April, yet it failed to file its motion for leave to amend until July 8, 2011. Arguably, that was because there was a 30-day stay entered on June 8, 2011. However, the Court cannot ignore that, despite knowledge since mid-April of facts allegedly supporting the amended complaint, HydroChem did not move to amend until after PSC, a non-party, filed a lawsuit in their mutual home state of Texas requesting a declaration of its rights with respect to whether PSC is constrained by the Marshall and Brown Agreements, since it is not a party to either agreement. *PSC Industrial Outsourcing, LP v. Aquilex HydroChem, Inc.*, Case No. 2011-37546 (District Court, Harris County, Texas, 189th Judicial District) (Doc. No. 39-3). PSC's lawsuit involves state law claims between two non-diverse companies, both Delaware corporations with their principal places of business in Texas.[9] The claims that HydroChem seeks to add to the instant lawsuit are all within the subject matter jurisdiction of the Texas state court where PSC filed its declaratory judgment action and, therefore, could be brought there.[10]

---

[9] HydroChem's assertion that PSC's lawsuit in Texas is an attempt to preempt this Court's jurisdiction lacks merit. PSC's lawsuit is not attempting to invalidate either the Marshall Agreement or the Brown Agreement. It merely seeks a declaration that PSC, as a non-party to either Agreement, is not bound by the Agreements. PSC could not have joined its action to the instant action because it would have destroyed diversity jurisdiction.

[10] The original complaint in the instant case was based on diversity jurisdiction: it was brought against two Ohio residents (Marshall and Brown) by a Delaware corporation with its principal place of business in Texas (HydroChem). HydroChem has attempted to create federal question jurisdiction here by adding a claim in the PSAC

There is nothing about the above-outlined scenario that protects the rights of Marshall and Brown. Only plaintiff would receive a benefit from the filing of a second amended complaint.[11] Further, plaintiff is not foreclosed from bringing its claims within the context of the Texas lawsuit or in an entirely new lawsuit. In short, the Court finds that allowing a Second Amended Complaint would be unduly prejudicial to the defendants.

### III. CONCLUSION

For the reasons discussed above, plaintiff's motion for leave to file a second amended complaint (Doc. No. 36) is **DENIED**.

**IT IS SO ORDERED**.

Dated: September 1, 2011

_____

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

under the Computer Fraud and Abuse Act. This seems to be an attempt to bring in a non-diverse party (i.e., PSC) that could otherwise not be joined. This Court has doubts as to whether, even if the amendment were permitted, this would be the proper venue for these new claims.

[11] The Court also rejects as unsupported HydroChem's argument that there would be no unfair prejudice to Marshall and Brown because their defense is being paid for by PSC, whose lawyers also represent Marshall and Brown. HydroChem asserts that "there is no prejudice in simply making PSC and its executives parties in a more formal sense." (Doc. No. 39, at 8.) HydroChem suggests that Marshall's deposition testimony which failed to implicate anyone but himself was somehow manufactured and "[t]o the extent PSC and/or its executives have made it worth Marshall's while to admit liability to protect PSC, this is all the more reason that they should be added as parties to this litigation." (*Id.*, n. 12.) This is a serious allegation which is mere speculation unsupported by the record before this Court.